## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-CR-30114-MJR-1 |
| | ) | |
| JIWON JIWON PARK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

### A.   Procedural History

On June 27, 2015, Defendant Jiwon Jiwon Park was pulled over by Illinois State Trooper Beau Marlow. At the conclusion of the traffic stop, Marlow found multiple kilograms of cocaine and arrested Park. On June 29, 2015, a federal indictment charged Park with a single count of possession with intent to distribute cocaine in excess of five kilograms, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (Doc. 1.)

Park filed a motion to suppress on September 15, 2015, arguing that his Fourth Amendment rights were violated during the traffic stop and the search of his rental vehicle. (Doc. 37.) The Government filed a response. (Doc. 43.) The Court held a hearing on December 4, 2015. (Doc. 52.) On December 11, 2015, the Court granted the Government's motion for extension of time to file a supplemental response addressing concerns raised by defense counsel during the hearing as to Marlow's credibility.

(Docs. 46, 47.) The Government filed its supplement on December 15, 2015. (Doc. 48.) Fully briefed, the Court will begin with a synopsis of the underlying facts in the case.[1]

**B.  Relevant Facts**

On June 27, 2015, at approximately 10:10 a.m., Marlow observed a gray 2015 Toyota Camry bearing Nevada plates traveling eastbound in the left lane on Interstate 70 in Madison County, Illinois. From his vantage, Marlow observed the vehicle following too closely to a white sport utility vehicle, creating an interval between the two vehicles of less than one second. The white SUV eventually switched lanes, at which point the vehicle overtook the SUV and began following a dark colored sedan at a similarly dangerous interval. The vehicle then moved to the right lane, decreasing its speed as it did so. Marlow, now positioned behind the vehicle, instituted a traffic stop.

Marlow exited his car and approached the vehicle on its passenger side. While approaching, Marlow observed a backpack and blanket in the backseat. He also saw several bottles of water and a bag of food items in the front passenger compartment, as well as three cellphones in the front, center console. Marlow testified that the contents of the car indicated to him that the driver was not traveling in a "leisurely manner."

Through the front passenger window of the vehicle, Marlow made contact with the driver and lone occupant of the vehicle, Defendant Park. Marlow testified that he noticed the artery on the right side of Park's neck was rapidly pulsating, indicating to

---

[1] In addition to briefs from both parties, live testimony from Marlow, and exhibits, the Government introduced Marlow's dash camera video as evidence, which recorded the entire event.

the trooper that Park was "extremely nervous."[2] Marlow eventually moved to the driver's side of the vehicle. Upon request, Park handed Marlow his driver's license. A California license, it identified Park's residence as Las Vegas, Nevada. Park also provided Marlow with the vehicle's rental agreement. The rental agreement indicated that the vehicle had been rented in Las Vegas on June 25, 2015 (two days prior to the traffic stop), and was due back in that city on July 1, 2015, in four days. At the hearing on this matter, Marlow informed the Court that Park's right hand was shaking when he handed Marlow his driver's license and rental agreement, and that Park generally displayed an "unusual" and "heightened" level of nervousness.

Marlow informed Park that he was going to issue him a written warning for following the white SUV and dark sedan too closely. At Marlow's behest, Park exited the vehicle and accompanied Marlow to the trooper's car. After being briefly patted down, Park entered the front passenger seat of Marlow's squad car, sitting opposite Marlow (who was seated in the driver's seat). Marlow testified that Park's demeanor upon entering the car raised his suspicions that criminality was afoot: Park laughed at inappropriate times and produced what Marlow termed "unproductive yawns"—that is, "half yawns" that Marlow testified are triggered by high levels of adrenaline.

In the squad car, Marlow conducted a computer search using the information on Park's driver's license. While ordering up the computer search, he asked Park about his

---

[2] Park's demeanor while being questioned by Marlow is not captured by the dash camera video until around the 4:05 minute mark, when Park enters Marlow's squad car.

travels. Park told Marlow that he was traveling to Chicago and New York and then back west to Arizona for business meetings related to his clothing company. This raised Marlow's suspicions, given that Park's rental vehicle was due back in Las Vegas in four days. As Park answered Marlow's questions about his travels and business ventures, Marlow testified that Park was very talkative. Again Marlow was alerted to a pulsating artery in Park's neck, and Park's laughter and "half yawns."

Park's driver's license information came back as valid on Marlow's computer, and the computer indicated that there were no warrants out for Park's arrest. Marlow again told Park that he would be issuing him a written warning for driving too closely. However, the contents of Park's car, his nervous behavior, his unusual travel plans, and the fact that he resided in an area of the country (the southwestern United States) well known as a point of origin for contraband made Marlow suspicious that Park was involved in criminal behavior. So, while writing the warning, Marlow inquired further into Park's clothing businesses and travel plans. Marlow visited the website of one of Park's businesses and noticed that the website appeared legitimate. He also inquired as to why Park was driving the expanse of the United States instead of flying. Park's response that he was driving due to a lack of sleep following the birth of his child and because he had to stop at many places further raised Marlow's suspicions.

Marlow handed Park a written warning and returned his driver's license seven to eight minutes from the time Park first entered Marlow's squad car. Marlow told Park

he was free to leave; however, as Park was leaving Marlow's the squad car, Marlow asked him if he would mind answering some additional questions. Park agreed and resumed sitting in the passenger seat of the squad car. Marlow asked about Park's travel plans again. He then asked him if all of the items in the rental vehicle belonged to him. Park said that they did. Marlow asked if there was anything illegal in the vehicle, to which Park said there was not. Marlow then asked if Park was responsible for all of the items in the vehicle, and Park said that he was. Upon further questioning, Park advised Marlow that there was a bag in the trunk of the vehicle. When Marlow inquired as to whether Park would consent to opening the trunk, Park responded in the affirmative. This series of questioning lasted for approximately three minutes.

Park and Marlow exited the squad car and approached the rental vehicle's trunk. Park opened the trunk, revealing a black duffel bag and a white "Bath & Body Works" cardboard box with several layers of packaging tape on its seams. Park reported that the box contained "shirts and stuff." Marlow asked Park to open the box. Park began to pull the numerous layers of tape from the "Bath & Body Works" box. After opening the box, Park took what Marlow described as an "exaggerated step backwards."

The box contained numerous packaging materials. Marlow asked Park to pull out a shirt from the box. Park asked if he was required to do so. Marlow again asked him to pull out a shirt, and Park again asked if he had to. Marlow informed him that he did not have to, but asked if he would anyway. Park laughed nervously, and Marlow

asked if there was anything illegal in the box. Park answered, "Yes, sir." When Marlow asked Park to identify the illegal contents contained within the "Bath & Body Works" box, Park placed his hands behind his back as if in preparation for being handcuffed and stated that he would rather not say. At this point, Marlow handcuffed Park and placed him back inside his squad car. An ensuing search of the box resulted in the discovery of six vacuum-sealed, kilo-shaped bundles of what looked to be cocaine.

In his motion to suppress, Park questions the reasonableness of the stop, as well as the search and seizure after the stop. The Court will address both arguments in this Order. First, however, the Court will discuss the issue of Trooper Marlow's credibility.

### C. <u>Trooper Marlow's Credibility</u>

The Court's legal conclusions are dependent, in part, on its determination that Trooper Marlow's testimony during the hearing on this matter was credible. Defense counsel attempted to call into question Marlow's credibility by introducing into evidence the written opinion of the Appellate Court of Illinois, Fifth District, in *People v. Moffitt*, No. 5-11-0250, 2012 WL 7105557 (Ill. App. Ct. April 6, 2012). That case concerns a traffic stop instituted by Marlow which was eventually held invalid by both the state trial and appellate courts. In support of its rationale that Marlow's search had been invalid, the appellate court noted that the lower court "made no express findings regarding Officer Marlow's testimony." *Id.* at *6. Further, the court noted "that the video recording affirmatively contradicted much of Officer Marlow's testimony about

the defendant's demeanor during the stop, which makes it quite likely that the court treated the rest of his testimony with suspicion as well." *Id.*

Although the video in this case is not conclusive that Park exhibited nervous behavior sufficient to arouse reasonable suspicion of criminal behavior, it certainly does not contradict Marlow's testimony to that effect. Further, the Court is unconvinced that the facts of the *Moffitt* case loom sufficiently large over Marlow's character to support the view that his credibility is suspect, especially given his nine years of law enforcement service. Therefore, this Court finds that Marlow's testimony was credible.

### D. <u>Legal Standards</u>

#### 1.  The Fourth Amendment

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." **U.S. CONST. amend. IV.** Challenges to evidence under the Fourth Amendment present two distinct questions: "(1) whether a search or seizure actually occurred; and (2) if so, whether the search or seizure was unreasonable." ***United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011).** There is no dispute that the first inquiry is established in this case. The question, therefore, is the reasonableness of the search and seizures that occurred.

### 2.  Reasonableness of the Stop

The temporary detention of an individual by a police officer pursuant to a traffic stop "constitutes a 'seizure' of 'persons'" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). The decision to stop a vehicle is reasonable when there is probable cause that a traffic violation has occurred. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (*citing Whren*, 517 U.S. at 810). Probable cause exists when there is a belief that a minor traffic offense has been committed. *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). Following too closely, the offense for which Marlow stopped Park, is a violation under Illinois law. *See* 625 ILCS 5/11-710.

Based purely on the video evidence, it is a close question whether Defendant was following the SUV and sedan too closely. The question, however, is not whether Defendant *was* following the vehicles too closely, but whether Marlow had probable cause to believe that Defendant was following too closely. *Muriel*, 418 F.3d at 724. Illinois law provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent." 625 ILCS 5/11-710(a). The Court credit's Marlow's testimony that from his vantage point, Park, who was traveling with the flow of traffic, was driving within one second of the SUV and sedan, in violation of guidelines promulgated by the Illinois Secretary of State. *See* ILLINOIS RULES OF THE ROAD 76 (2015), *available at* cyberdriveillinois.com (interpreting Illinois' "following

**too closely" statute).** Therefore, the Court finds that Marlow had probable cause to believe that Park was following the other cars closer than was reasonable and prudent.

### 3.  Reasonableness of Seizure and Search After Stop

#### a.  Seizures Incident to a Traffic Stop

"The ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, **135 S.Ct. 530, 536 (2014);** *Brigham City v. Stuart*, **547 U.S. 398, 403 (2006).** Reasonableness is "measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest*." Johnson v. Manitowoc Cnty.*, **635 F.3d 331, 335 (7th Cir. 2011).**

In *Rodriguez v. United States*, **135 S.Ct. 1609 (2015)**, the United States Supreme Court spoke at length about seizures that occur incident to traffic stops. As noted in *Rodriguez*, traffic stops are investigatory stops—"more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Id.* **at 1614;** *see also Knowles v. Iowa*, **525 U.S. 113, 117 (1998);** *United States v. Walden*, **145 F.3d 487, 490 (7th Cir. 1998) ("A traffic stop is governed by the principles established in** *Terry v. Ohio* **and its progeny.").**

It follows that the detention may not last beyond what is necessary to complete the purpose of the stop, and that authority for any seizure ends when the stop would have been completed, assuming diligent effort by the police. *Muriel*, **418 F.3d at 725;** *see United States v. Sharpe*, **470 U.S. 675, 686 (1985) ("In assessing whether a detention is**

**too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.")** An ordinary traffic stop may only be extended "[w]here an officer can articulate grounds that establish reasonable suspicion of criminal activity." **United States v. Wyatt, 133 F. App'x 310, 313 (7th Cir. 2005).** Reasonable suspicion "requires more than a hunch but less than probable cause." **Gentry v. Sevier, 597 F.3d 838, 845 (7th Cir. 2010).** As stated in *Walden*:

> Under *Terry*, a police officer may perform an investigative stop when there is reasonable suspicion, based on specific and articulable facts, that "criminal activity may be afoot." Whether or not there is reasonable suspicion is determined based on the totality of the circumstances.

**146 F.3d at 490 (internal citations omitted).**

During the course of the stop, an officer may ask questions, and a "traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." **United States v. Martin, 422 F.3d 597, 601-02 (7th Cir. 2005) (citing *Childs*, 277 F.3d at 953-54).** Information obtained through observation and questions asked during a traffic stop may provide an officer with reasonable suspicion of criminal activity sufficient to prolong the stop long enough to permit reasonable investigation **United States v. Figueroa-Espana, 511 F.3d 696, 702**

**(7th Cir. 2007);** *Muriel***, 418 F.3d at 725.** However, the length of the detention must always remain reasonable. *Figueroa-Espana***, 511 F.3d at 702-03.**

There are many bases of suspicion that may be considered in a totality of the circumstances analysis, including the driver's nervousness, *United States v. Tinnie***, 629 F.3d 749, 752 (7th Cir. 2011)**, point of departure from a well-known drug interdiction area, *United States v. Johnson***, 910 F.2d 1506, 1509-10 (7th Cir. 1990)**, implausible travel plans, *United States v. Childs***, 256 F.3d 559, 566 (7th Cir. 2001)**, the presence of multiple cellphones, *United States v. Guerrero-Sanchez***, 412 F. App'x 113, 139 (10th Cir. 2011),** inadequate luggage, *United States v. Brugal***, 209 F.3d 353, 359 (4th Cir. 2000),** and an unusual route of travel, *Guerrero-Sanchez***, 412 F. App'x at 139.** Observations which might be innocent in isolation may still be the basis for reasonable suspicion when considered in the aggregate. *United States v. Baskin***, 401 F.3d 788, 793 (7th Cir. 2005).**

    b.   Unreasonable Searches

The Fourth Amendment also prohibits unreasonable searches. However, "[a] consensual encounter between an individual and a law enforcement official does not trigger Fourth Amendment scrutiny." *Figueroa***, 511 F.3d at 702;** *see also United States v. Drayton***, 536 U.S. 194, 207 (2002).** Factors relevant to the existence of consent include "whether the encounter took place in public, whether the suspect consented to speak to police, whether the officers told the suspect that he was not under arrest and free to

leave, whether the suspect was moved to another area, the number of officers present and whether they displayed weapons or physical force." *Figueroa*, **511 F.3d at 702.**

**E. <u>Application</u>**

Having established that Marlow's stop of Defendant Park was reasonable, the Court will now confront Defendant Park's argument that the search and seizure that occurred after the stop were unconstitutional. Defendant first challenges the reasonableness of the detention incident to the traffic stop. Defendant argues that he was detained and questioned for a period well beyond that required for the issuance of a traffic ticket. He contends that Marlow could have written the traffic warning ticket in under one minute; instead, the trooper issued Park the ticket after more than seven minutes, in which time he used his computer to investigate Park's businesses and questioned Park about issues that were not related to his traffic violation.

Defendant's contention is off the mark. As to the length of time it took Marlow to write and issue the ticket, the Court credit's Marlow's testimony that, along with writing the ticket, the trooper was running a database search using Park's license and rental agreement; investigating the website of one of Park's business; and inquiring into Park's travel plans, reasons for traveling, personal life, and business ventures. Further, the questions and observations Marlow made were clearly permissible, even though they did not concern the nature of the stop itself. *See Childs*, **277 F.3d at 954**. It was through his questions and observations that Marlow was able to "articulate grounds

that establish[ed] reasonable suspicion of criminal activity." *Wyatt*, **133 F. App'x at 313**.

Prior to ever issuing Park his warning, Marlow:

- Saw a vehicle with out of state plates from a known drug interdiction area;

- Observed the vehicle violate Illinois traffic law;

- Observed that the vehicle contained limited contents;

- Observed three cell phones in the front console of the vehicle;[3]

- Learned that Park resided in a known drug interdiction area;

- Learned that the vehicle was a rental and that it was due back in Las Vegas in four days, even though Park was traveling to Chicago and New York and then back west to Arizona;

- Learned that Park was driving eastward for nondescript "business meetings";

- Learned that Park was driving cross-country instead of flying because he was lacking in sleep following the birth of his child and because he had "to stop by a lot of places"; and

- Observed outward signs of nervousness from Park, including shaky hands, a pulsating vein, and excessive laughing and yawning.

The Court acknowledges that it is possible that none of the above-listed observations, *in isolation*, would be sufficient to raise a hunch to the level of reasonable suspicion. Defendant in particular contends that the dash camera video contradicts Marlow's repeated assertions that Park exhibited overly nervous behavior. The Court

---

[3] At the hearing, defense counsel introduced into evidence as Defendant's Exhibits #2 and #4 crime scene photographs of the interior of the vehicle as Marlow observed it when he initially approached the vehicle. The photographs show only two cell phones as visible. The Court, however, credit's Marlow's testimony that he viewed the console from a different angle from where the photographs were taken. Further, the Court notes that even the presence of two cell phones has been found to contribute to reasonable suspicion of a drug courier situation. *See Guerrero-Sanchez*, **412 F. App'x at 139.**

believes that the video evidence is inconclusive as to whether Park exhibited a degree of nervous behavior sufficient to promote reasonable suspicion of criminal activity. It also, however, credits Marlow's testimony as credible. That said, nervousness is but a single factor in the totality of circumstances analysis. *See United States v. Brown*, **188 F.3d 860, 865 (7th Cir. 1999).** Even excluding Park's level of nervousness from the analysis, Marlow, a trooper with nine years of law enforcement experience, still witnessed several other indicia of possible criminal activity in a short period of time (around nine minutes from the time he pulled Park over to the time he handed Park the ticket). By the time Marlow returned Park's license and completed the warning ticket, he had more than sufficient reasonable suspicion to extend the stop.  *Muriel*, **418 F.3d at 726.**

Defendant goes on to dispute that he consented to re-enter Marlow's car after being told he could leave—his brief asserts that "[d]espite the suggestion that he was free to leave, Park like any other person trying to please the officer who stopped him on the interstate sat back down in the car to be interrogated further." Park also takes umbrage with his purported trunk consent, saying that it too was tainted.

The Court finds that Defendant voluntarily and knowingly consented to answer additional questions after Marlow issued the warning. Marlow's in-court testimony and the camera recording of Marlow's request to ask Park additional questions contradict Park's contention that his consent was not freely given. Marlow did not brandish or make obviously visible his firearm, there were no other officers present, Marlow told

Park he was free to leave, the questioning took place in public, and Park verbally gave his consent during an amenable, conversational exchange. There is no evidence that Marlow threatened physical force or attempted to coerce Park in any other way.

Park's consent to Marlow's search of the rental vehicle's trunk was also free from coercion. Park's consent was given in public and to a single, non-threatening officer. In fact, the consensual nature of the exchange is typified by the fact that, upon Park's refusal to pull a "shirt" from the "Bath & Body Works" box, Marlow informed Park that he was not in fact obligated to do so.[4] Accordingly, the Court finds that Park gave valid consent to Marlow, both as to the follow-up questions and to the search of the car.

### F.  Conclusion

For the reasons stated above, the Court **DENIES** Park's Motion to Suppress (Doc. 37).  The jury trial in this case remains set for February 1, 2016.

**IT IS SO ORDERED.**

**DATED:  January 7, 2016**

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**

---

[4] Park does not argue that he withdrew consent to search the trunk or the Bath & Body Works box within it during the exchange between himself and Marlow.  And even if he did withdraw consent at that point, Park informed Marlow that the box contained illegal materials at the same time that he expressed discomfort with Marlow continuing the search, so Park would have been authorized to search the Bath & Body Works box.  *See United States v. Ledford*, **218 F.3d 684, 687-88 (7th Cir. 2000)**.